## IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Opinion Number: 2009-NMSC-027**

**Filing Date:  May 27, 2009**

**Docket No. 30,443/30,454 consolidated**

**STATE OF NEW MEXICO,**

  **Plaintiff-Appellee,**

**v.**

**JOSEPH EVANS,**

  **Defendant-Appellant.**

**INTERLOCUTORY APPEAL FROM THE DISTRICT COURT OF MCKINLEY COUNTY**
**Robert A. Aragon, District Judge**

Hugh W. Dangler, Chief Public Defender
Michael L. Rosenfield, Assistant Public Defender
Albuquerque, NM

for Appellant

Gary K. King, Attorney General
Martha Anne Kelly,  Assistant Attorney General
Santa Fe, NM

for Appellee

### OPINION

**BOSSON, Justice.**

{1} This Opinion addresses two interlocutory appeals, which we hereby consolidate on our own motion.  Joseph Evans ("Defendant") appeals the district court's denial of his motion to suppress his confession, which he argues was involuntary.  The State appeals the district court's suppression of physical evidence stemming from a search warrant which the district court concluded lacked probable cause.  We affirm the district court's decision not to suppress the confession and reverse as to the suppression of the physical evidence.  This

1

case is remanded to the district court for further proceedings.

**BACKGROUND**

**{2}** Police discovered Felicia Penaloza's body partially wrapped in a fitted, white bed sheet, lying face-down in an arroyo northwest of Gallup on September 12, 2005. She was 16 years old. The Office of the Medical Investigator determined that she had been asphyxiated by a ligature around her neck, and by a black plastic trash bag tied over her head. The plastic bag was cinched around her neck with an "electrical type wire," according to an affidavit that police filed in support of an application for a search warrant.

**{3}** According to the same affidavit, police interviewed Seferino Griego three days after discovering Penaloza's body. Griego inculpated Defendant in the crime. Police also interviewed Defendant's mother, Sheree Thornton, whose account gave police further reason to believe Defendant may have been involved in the crime. We will address the statements of Griego and Thornton in detail below. Thornton also allowed New Mexico State Police Agent Patrick Ness to view the basement of her house where Defendant apparently kept a bedroom. Agent Ness saw exposed electrical wiring, sheets, two mattresses without linen, and a number of electrical wires of different sizes and colors. Police then interviewed a McKinley County Probation Officer who overheard Griego accuse Defendant of killing Griego's "girlfriend," and Defendant later say, "I guess I am a murderer."

**{4}** On September 17, 2005, New Mexico State Police Agent Henrietta Soland applied to McKinley County Magistrate Judge John Carey for a warrant to search Thornton's house. Magistrate Judge Carey granted the application, and police executed the search warrant on the same day, finding, among other things, a piece of an electrical cord which police claim matched the cord found around Victim's neck.

**{5}** The following day Agent Ness, who had not participated in the execution of the search warrant, and Agent Soland interviewed Defendant at the McKinley County Adult Detention Center. Defendant had been detained there for 13 days on charges unrelated to the present case. In a 90-minute interrogation, conducted in the afternoon in a visiting room at the detention center, Defendant ultimately acknowledged culpability in Victim's death. His story changed considerably throughout the course of the interrogation. He initially denied any involvement in the death, saying that he was merely present at his house when Victim was there. Then he denied killing her, but said he put the bag over her head after she was dead. Then he said he was with her when she "quit moving." And finally, he claimed he accidentally strangled her, although it is unclear in his testimony that he confessed to strangling her in the same manner as described in the medical examiner's autopsy report. Throughout the second half of the interrogation, Agent Ness made several statements which Defendant claims were impermissibly coercive.

**Procedural History**

2

**{6}** The District Attorney for the Eleventh Judicial District charged Defendant by criminal information on November 29, 2005 with an open count of murder in connection with Victim's death. The information also charged Defendant with one count of kidnapping and one count of tampering with evidence. Defendant waived his right to a preliminary hearing.

**{7}** Both of the appeals in this case are before this Court pursuant to *State v. Smallwood*, 2007-NMSC-005, ¶ 11, 141 N.M. 178, 152 P.3d 821, where we held that this Court has jurisdiction over interlocutory appeals in which a criminal defendant "may possibly be sentenced to life imprisonment or death."

**{8}** The first appeal, by the State, challenges the district court's suppression of the physical evidence obtained in the search of Thornton's house. The district court overturned Magistrate Judge Carey's finding of probable cause, but offered no explanation for its ruling, except for "the lack of probable cause as portrayed in the affidavit." The State argues that the affidavit provided the magistrate with a sufficient factual basis to conclude that there was probable cause to search. For reasons explained below, we agree and therefore reverse the district court on this issue.

**{9}** In the second appeal, Defendant argues that his confession was invalid because police tactics in eliciting the confession amounted to unconstitutional coercion. We disagree, and therefore affirm the district court for reasons explained in detail below.

## DISCUSSION

### Probable Cause for Search Warrant

**{10}** The Fourth Amendment to the United States Constitution requires police to obtain a warrant, issued by a judge or magistrate, before executing any search or seizure, subject to "a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). Probable cause to search a specific location exists when there are reasonable grounds to believe that a crime has been committed in that place, or that evidence of a crime will be found there. *See State v. Gonzales*, 2003-NMCA-008, ¶¶ 11-12, 133 N.M. 158, 61 P.3d 867.

**{11}** Put another way, before a valid search warrant may issue, the affidavit must show: "(1) that the items sought to be seized are evidence of a crime; and (2) that the criminal evidence sought is located at the place to be searched." *State v. Herrera*, 102 N.M. 254, 257, 694 P.2d 510, 513 (1985); *see also State v. Baca*, 97 N.M. 379, 379-80, 640 P.2d 485, 485-86 (1982) (same). There are no "bright-line, hard-and-fast rules" for determining probable cause, but the degree of proof necessary to establish probable cause is "more than a suspicion or possibility but less than a certainty of proof." *State v. Nyce*, 2006-NMSC-026, ¶ 10, 139 N.M. 647, 137 P.3d 587 (internal quotation marks and citations omitted).

**{12}** Our inquiry focuses on the *issuing* judge's conclusion as to probable cause. In this case, that means we look at the magistrate's conclusions, not the district court's. If we conclude that the magistrate's conclusions as to probable cause were correct, we uphold those conclusions regardless of the decision reached by the district court.

**{13}** We break our inquiry into two components. First we look at the magistrate's probable cause determination as to Victim's death. Then we address the related but separate question of probable cause that evidence from the murder would be found in the specific location to be searched.

**{14}** Defendant argues that the search warrant affidavit was insufficient because it relied principally on the statement of Seferino Griego, who told police, among other things, that he saw Defendant with Victim shortly before she died. If it were true that the only evidence the State presented in its affidavit was a single witness's account that Defendant was seen with Victim around the time of her death, Defendant might well be correct. But the State presented much more than that. In addition to Griego's account, the State offered evidence obtained from the prior consensual search of Defendant's bedroom, including "numerous electrical wires/chords [sic] of different sizes and colors." In the same search, the agent also saw two mattresses without linens and other bedding material—observations which take on added importance given that Victim's body was found wrapped in sheets and tied with electrical wires.

**{15}** The State also presented statements from Defendant's mother which showed Defendant telling conflicting stories about his activities the night he borrowed his mother's van, around the time Victim disappeared. The State presented a statement from a probation officer who told police that during a chance encounter between Defendant and Griego in the booking area of the McKinley County jail, Griego loudly accused Defendant of killing Griego's "girlfriend." The probation officer said that Defendant did not immediately respond to Griego's accusation, but once he was in his holding cell, said "I guess I am a murderer."

**{16}** In addition, the State presented Griego's allegation that Defendant had called him around the time of Victim's death saying cryptically that he, Defendant, needed to "take out the garbage" and "take out the trash." Griego told police that the conversation confused him.

**{17}** Like Griego's statements to police, the allegation that Defendant said, "I must be a murderer," by itself, would likely not give rise to a finding of probable cause. Jailhouses are commonly understood to be places of exaggeration, deception, and braggadocio. Police gave little information in the affidavit about the manner in which Defendant spoke. Was he boastful, contemplative, sarcastic? It is not clear. Nonetheless, the statement can be considered in context with all the other information police provided in support of the search warrant application.

**{18}** Similarly, the stripped mattresses and exposed electrical wires in Defendant's

4

bedroom, along with the electrical wires and sheets on Victim's body, would be insufficient if they stood alone. Nothing in the affidavit definitively matches the electrical wires in the basement bedroom with the wire found around Victim's neck. Police apparently made such a match only *after* executing the search warrant. In *State v. Hernandez*, 111 N.M. 226, 229, 804 P.2d 417, 420 (Ct. App. 1990), our Court of Appeals held that there was no probable cause to support a search warrant where police presented evidence that blood had been found at the scene of a burglary and the defendant was later found to have a cut on his hand. The blood at the scene was apparently not matched chemically or genetically to the accused. A trail of stolen items led from the burgled location "in the direction towards" the accused's residence. *Id*. at 227, 804 P.2d at 418. Considering only the evidence of blood at the scene and on the accused's hand, along with the trail of stolen items, our Court of Appeals found a lack of probable cause to search the accused's house. *Id*. at 229, 804 P.2d at 420.

**{19}** Defendant argues that the present case is the same as *Hernandez*, asserting that the affidavit contains "a glaring lack of any concrete information." Defendant further argues that the primary reason given to acquire the search warrant is that one person, Griego, said Defendant was the last person seen with Victim. In arguing that this Court should treat the present warrant the same way the Court of Appeals treated the affidavit in *Hernandez*, Defendant overlooks two important things. First, Griego's testimony is not the only basis the State provided for a search warrant. Second, far from a "lack of concrete information," the affidavit contains, as we have described, a considerable amount of information from several different sources.

**{20}** Like the investigators in *Hernandez*, the police in this case found physical evidence at the scene of the crime which provides a link to further evidence found on the accused or, in this case, in Defendant's bedroom. In *Hernandez*, the evidence at the scene was blood, and the evidence on the accused was the cut hand. In the present case, the evidence at the scene was electrical wires and missing bed sheets, while the evidence at the scene was similar wires and bed sheets on the corpse. The critical difference between the cases is that here, police provided valid and significant evidence, in addition to the physical evidence, connecting Defendant with the crime. In *Hernandez*, police did not.

**{21}** True, the affidavit in this case provides no single piece of evidence as telling as the "reddish stain" and foul odor in the trunk of the accused murderer's car in *State v. Ferrari*, 80 N.M. 714, 717, 460 P.2d 244, 247 (1969), where this Court concluded that a police search warrant affidavit adequately supported probable cause. But such overwhelming physical evidence is not required in every case to establish probable cause. Here, the police demonstrated substantial investigative efforts to supplement the physical evidence they did have: the electrical wire and bed sheets. They obtained statements from at least three named witnesses, including a description of Defendant's own words in jail and the strong suggestion that he had told associates and family members different things about his activities on the evening in question. All of this information viewed "as a whole," *Gonzales*, 2003-NMCA-008, ¶ 14, makes clear that the magistrate judge was justified in finding a probability that Defendant was involved in Victim's disappearance and death.

**{22}** Defendant argues that there is "no causal relationship" between Victim's disappearance and Defendant's statement that he needed to "take out the garbage." He similarly argues that the affidavit "totally fails to show any significance" in the fact that Griego last saw Defendant with Victim. These arguments are unavailing. We have never said that police must establish every link in the inferential chain that leads to probable cause. Rather, all that is required is that police make a showing that permits "more than a suspicion or possibility but less than a certainty of proof." *Nyce*, 2006-NMSC-026, ¶ 10 (internal quotation marks and citations omitted).

**The Affidavit Established a Sufficient Nexus With the Place Searched**

**{23}** We now turn to the issue of whether the evidence supports a finding of probable cause to believe that evidence might be found in the basement bedroom of the house of Defendant's mother.

**{24}** We take this opportunity to clear up some ambiguity in our case law. Some of our cases have implied that probable cause to believe a suspect has committed murder necessarily produces probable cause to search the suspect's home. *See Ferrari*, 80 N.M. at 718, 460 P.2d at 248 (observing that probable cause that a suspect committed murder "[is ordinarily sufficient] to justify the search of [the suspect's] house and the surrounding area and his business"). That is not true in every case. Probable cause to believe a defendant has committed a crime, and particularly the crime of murder, will often exist simultaneously with probable cause to believe there is evidence in the accused's home. But probable cause does not follow ineluctably from an allegation of murder or any other crime. The link between the two conclusions must be made by the reviewing judge or magistrate on a case-by-case basis. Numerous courts in our sister states, as well as federal courts, have made clear that probable cause to believe an accused has committed a crime does not necessarily equate to probable cause that the home of the accused will contain evidence of the crime. *See, e.g.*, *United States v. Waxman*, 572 F. Supp. 1136, 1146 (E.D. Pa. 1983) ("It does not follow in all cases, however, that simply from the existence of probable cause to believe a suspect is guilty, there also is probable cause to search his residence."); *State v. Dillon*, 419 So. 2d 46, 51 (La. Ct. App. 1982) ("[F]acts supporting probable cause to arrest do not necessarily give rise to probable cause to search a defendant's residence . . . ."); *Commonwealth v. Cinelli*, 449 N.E.2d 1207, 1216 (Mass. 1983) (In the context of a murder charge, relying on *United States v. Charest*, 602 F.2d 1015, 1017 (1st Cir. 1979), for the proposition that "[i]nformation establishing that a person is guilty of a crime does not necessarily constitute probable cause to search the person's residence.").

**{25}** The fundamental inquiry is whether there is probable cause to believe there will be evidence of a crime *at a particular location*. *See Herrera*, 102 N.M. at 257, 694 P.2d at 513. Residence may be a component of this, but residence is not necessary, nor is it always sufficient, to establish probable cause to believe that the location to be searched contains evidence of a crime. Police must give the issuing magistrate probable cause to believe that evidence will be at the particular location in question, whether it is a suspect's home or not.

6

**{26}** In this case, there was probable cause to search even though it is not totally clear in the affidavit that Defendant made his residence at his mother's house. The affidavit sought a warrant to search a house at 1506 South Cliff Drive in Gallup. Before filing the affidavit, police had already done a preliminary, consensual search of the basement.

**{27}** In that initial search, police discovered electrical wiring and bedding similar to those found at the crime scene which, as we have already noted, provide an inferential link between Defendant and Victim's death. In addition to this indication that there would be further evidence at the house, Thornton told police that Defendant had been in her house on, or near, the night Victim was last seen with Defendant, and that Defendant left the residence in Thornton's van. It would be a reasonable inference from the information presented in the affidavit that Victim was also at Thornton's house on the night in question. Defendant told his mother he needed to borrow her van to pick Victim up from Griego's house. Defendant later told a different, and conflicting, story to his mother, saying that he had come home alone and that Victim had showed up at Thornton's house with another man. Regardless of which story is true, both place Victim at Thornton's house on the night in question. Finally, it appears from the face of the affidavit that Thornton and Defendant referred to the basement as "home" —a suggestion that the basement was Defendant's primary residence.

**{28}** The magistrate found probable cause. Viewing all of the evidence in totality, we conclude that it had a sufficient basis in evidence to do so. Because the district court concluded otherwise, we reverse the district court as to its granting of Defendant's motion to suppress the evidence gathered pursuant to the search warrant. The district court offered no basis for its conclusions, so we cannot explain in any greater detail our basis for reversing that court.

## ADMISSIBILITY OF CONFESSION

**{29}** Defendant argues that his September 18, 2005 statement to police, admitting culpability in Victim's death, should have been suppressed for two reasons. First, he asserts that police used coercive tactics which rendered his statement involuntary. Second, Defendant argues that because police relied on information unlawfully seized from the basement room in his mother's house, the confession was tainted. Defendant further argues that his September 19, 2005 confession, made one day after the first confession, should have been suppressed because it was tainted by the initial, allegedly coerced confession.

**{30}** Defendant agrees with the State that he voluntarily waived his *Miranda* rights, and he makes no claim to this Court that he did not receive his *Miranda* warnings and validly waived them. Rather, he asserts only that police used coercive means to obtain his confession, after the proper *Miranda* waivers.

**{31}** Because we have already determined that police lawfully seized the evidence from the house of Defendant's mother, we need not address his argument that unlawfully seized evidence tainted the confession. We begin, then, with Defendant's contention that his

September 18 statement was coerced.

**STANDARD OF REVIEW**

**{32}**   We review de novo the voluntariness of confessions. *See State v. Attaway*, 117 N.M. 141, 145, 870 P.2d 103, 107 (1994) (citing *Aguilar v. State*, 106 N.M. 798, 799, 751 P.2d 178, 179 (1988)).

**{33}**   We base our determination of whether a confession is voluntary on whether "official coercion" has occurred. *State v. Munoz*, 1998-NMSC-048, ¶ 21, 126 N.M. 535, 972 P.2d 847 (internal quotation marks and citation omitted). Official coercion occurs when "a defendant's 'will has been overborne and his capacity for self-determination [has been] critically impaired.'" *Id.* ¶ 20 (quoting *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)). There must be an "essential link between coercive activity of the State . . . and a resulting confession by a defendant." *Id.* ¶ 21 (quoting *Colorado v. Connelly*, 479 U.S. 157, 165 (1986)); *see also State v. Barr*, No. 30,191, slip op. at 11 (N.M. Sup. Ct. May 22, 2009).

**{34}**   On a claim that police coerced a statement, the prosecution bears the burden of proving by a preponderance of the evidence that a defendant's statement was voluntary. *State v. Fekete*, 120 N.M. 290, 298, 901 P.2d 708, 716 (1995). The failure to make such a showing requires a ruling that the confession was involuntary as a matter of law. *State v. Tindle*, 104 N.M. 195, 198, 718 P.2d 705, 708 (Ct. App. 1986).

**{35}**   Defendant asserts that he was high on methamphetamines during his September 18 interrogation at the McKinley County Detention Center, where he was already incarcerated on an unrelated charge. He claims the drugs, combined with a lack of sleep, made him hallucinate during the interrogation. He appears to assert, although it is somewhat unclear in the record, that in describing his actions to police he was narrating what he saw in his hallucinations, rather than describing his memory of reality. Defendant alleges that, in concert with other aspects of the interrogation, which we detail below, the hallucinations made his confession involuntary.

**{36}**   The district court viewed with skepticism Defendant's claims about the purported hallucinations and their effect on his capacity. The court concluded, after hearing testimony from Defendant and from his interrogators, that Defendant "was in full control of his faculties when these interviews took place."

**{37}**   If faced with conflicting evidence, we defer to the district court's factual findings, so long as those findings are supported by evidence in the record. *State v. Cooper*, 1997-NMSC-058, ¶ 26, 124 N.M 277, 949 P.2d 660 (citing *Culombe*, 367 U.S. at 603). We are unable to view the witness's demeanor or his manner of speech, and therefore are not in a position to evaluate many of the aspects of witness credibility that the trier of fact may evaluate. While we are not required to accept the district court's conclusion that Defendant was fully able to distinguish between reality and fantasy during his interrogation, we do give

credence to that factual finding, particularly because there is little in the record, apart from Defendant's own words, which suggests otherwise.

{38}    Our own reading of the transcript discloses no indications that Defendant was "narrating" from hallucinations.  To be sure, there is a disjointed and rambling quality to Defendant's long and, at times, nonsensical responses.  In addition to the lack of obvious signs in the transcript that Defendant was describing things that did not exist, there is no indication in the record that the law enforcement officers who interrogated Defendant were aware of his purportedly vulnerable mental state.  Case law makes clear that when interrogators are unaware of, and therefore cannot exploit, the mental or emotional vulnerabilities of a suspect, the crucial link between the confession and official action is missing.  *See Connelly*, 479 U.S. at 165; *see also Fekete*, 120 N.M. at 299, 901 P.2d at 717 ("[A] confession is not involuntary solely because of a defendant's mental state.").

{39}    It is clear, therefore, that Defendant's assertion of hallucinations is insufficient to render his confession involuntary.  Our analysis does not end there, however, because we must look to the totality of circumstances in making our determination as to the voluntariness of Defendant's confession.

{40}    We turn next to Defendant's claims that several statements made by his interrogators were coercive to the point that they made his confession involuntary. All of the statements were made by Agent Ness and were in response either to Defendant's claims that he was not involved in the killing, or that his involvement was only minimal.  They were part of Agent Ness's larger effort to convince Defendant that confessing would be beneficial to his case—an effort we discuss in greater detail below.  The State stipulated that Agent Ness made the statements that follow:

> "You're digging a hole you're not gonna be able to get out of."
> "This is the one percent of the time, I tell you, if you keep quiet they're gonna hammer you."
>
> "[I]f you leave it like it is, you're through . . . ."

Defendant's interrogator made this statement after Defendant denied involvement in the killing:

> "Just because you don't wanna be a rat, you're gonna be treated as a monster
> in court and you're never gonna get out of prison."

{41}    These statements were part of an interrogation at the county jail that lasted about 90 minutes.  They occur in rapid succession, about midway through the interrogation, and after many minutes of long and somewhat rambling statements by Defendant.  It is clear on reading the transcript of the interrogation that Defendant essentially dominated the first half of the discourse.  About halfway through the interrogation, Agent Ness began steering the

9

interview by asking more pointed questions.

**{42}** Many cases have noted that threats and promises may rise to the level of coercive behavior by police. *See, e.g.*, *Tindle*, 104 N.M. at 199, 718 P.2d at 709 (holding that an express promise of leniency "renders a confession involuntary as a matter of law"); *cf. State v. Lobato*, 2006-NMCA-051, ¶¶ 16-21, 139 N.M. 431, 134 P.3d 122 (holding that an interrogator leaving the "overall impression" that the accused would receive treatment if he confessed does not amount to coercion); *State v. Munoz*, 111 N.M. 118, 121, 802 P.2d 23, 26 (Ct. App. 1990) (holding that a confession was voluntary where police told the accused that "in his experience, first offenders who cooperated were less likely to go to jail than other defendants"). We have also noted, however, that where promises are merely implied, they are only one factor to be considered in the overall totality of circumstances. *Tindle*, 104 N.M. at 199-200, 718 P.2d at 709-10. Threats of physical violence, where credible, can render a confession involuntary. *See Arizona v. Fulminante*, 499 U.S. 279, 286-87 (1991).

**THREATS**

**{43}** The critical difference in the case law between impermissibly coercive threats and threats which do not cross the line is in how credible and immediate the accused perceives the threat to be. Threats which the accused may perceive as real have been held to be impermissibly coercive. *See id.* (holding that where defendant-inmate had a below-average IQ and had already received "rough treatment" by other inmates and was a convicted child murderer, a promise to protect him from further physical violence if he confessed amounted to a "credible threat" of physical violence). On the other hand, threats that merely highlight potential real consequences, or are "adjurations to tell the truth," are not characterized as impermissibly coercive. *See, e.g.*, *Tindle*, 104 N.M. at 197-200, 718 P.2d 707-10 (holding that police threat to the defendant that the court would "hang [your] ass" if the defendant did not confess, a comment which was disputed by the State, did not render confession involuntary). It is not per se coercive for police to truthfully inform an accused about the potential consequences of his alleged actions. *See United States v. Munoz*, 150 F. Supp. 2d 1125, 1135 (D. Kan. 2001).

**{44}** Three of the four statements at issue here could be taken as threats: (1) "they're gonna hammer you"; (2) "you're through"; and (3) "you're gonna be treated like a monster in court and you're never gonna get out of prison." All of these statements lie between the two poles described above—the statements are more than adjurations to tell the truth, but less than credible threats of violence. "You're never gonna get out of prison" can reasonably be taken to refer to a potential life sentence—well within reality for a first-degree murder conviction, which is at issue in this case. "You're gonna be treated like a monster in court" appears to be a reference to the way those in court might perceive Defendant. The comment may be a stretch or an exaggeration, but it is not out of the realm of a real possibility. Agent Ness never specified what he meant by "you're through," or who he was referring to as "they" in "they're gonna hammer you." Both statements, taken in isolation, could be taken as a threat of physical violence. However, taken in context with the entire interrogation,

10

where Agent Ness repeatedly communicated to Defendant that he was not interested in vengeance, and certainly not in physical vengeance, the statements—vague though they are—cannot credibly be taken to threaten Defendant with physical violence.

**{45}** Viewing the interrogation as a whole, what Agent Ness appeared to be trying to tell Defendant is that unless he explained himself to Ness—unless he confessed—he would not be able to explain himself to a jury, which would have only the physical evidence with which to judge Defendant. That physical evidence, Agent Ness told Defendant, was damning. In truth, Defendant might have another chance to explain himself at trial, if he chose to testify. Telling Agent Ness the truth, however, even if Defendant ultimately did not testify, could accomplish the same goal. In short, Agent Ness's statements constitute half-truths —a reasonable expression of opinion about consequences to Defendant if he did not talk, but an exaggeration when it came to telling Defendant that the interrogation with police was his best chance to talk. The exaggeration is particularly acute when contrasted with the *Miranda* warnings given, which highlight the accused's right to remain silent and that anything said may be used against him. On the other hand, there is some truth to Agent Ness's assertions to Defendant. If, as Defendant maintained for a short time during the interrogation, he accidentally strangled Victim during a struggle, that could produce a markedly different result at trial than if he strangled her in cold blood. It could bring about a conviction for second-degree murder rather than first-degree murder.

**{46}** Our case law makes clear that deception is not coercive per se. *See State v. Aguirre*, 91 N.M. 672, 674, 579 P.2d 798, 800 (Ct. App. 1978) ("[D]eception, in itself, is not a basis for ruling, as a matter of law, that a confession should be suppressed."). The degree of deception is but one factor to consider in deciding whether a confession was given contrary to the accused's free will. Considering the deception as one factor in our analysis, we must also consider Defendant's probable reaction to those statements. *Cooper*, 1997-NMSC-058, ¶ 27 (citing *Culombe*, 367 U.S. at 603, 604). At the time of the confession, Defendant was a 30-year-old man who, in the district court's words, was "in full control of his faculties," and who had prior exposure to the criminal justice system.[1] Agent Ness made veiled and somewhat ambiguous threats to Defendant, but unlike the "mentally dull" teenage defendant in *Payne v. Arkansas*, 356 U.S. 560, 567 (1958), or an illiterate defendant with mental retardation, as in *Culombe*, 367 U.S. at 620, Defendant had an adult capacity to sort exaggerated tough talk from real threats. There is certainly a point at which police threats, promises, or deception, would cross the line into coercion, but that line has not been crossed here.[2]

---

[1]The record discloses that Defendant did not have any criminal convictions prior to the incarceration mentioned in this case. The charges for which he was incarcerated do not appear in the record.

[2]Agent Ness also made one deceptive factual claim, and several others that might have been deceptive, although given the incomplete record before us, it is impossible to

11

**{47}** Defendant also asserts that because he maintained his innocence "for approximately the first hour" of the interrogation before claiming culpability, and because he admitted to actions that do not comport exactly with Victim's manner of death, his confession was involuntary. Defendant asserts that "[w]hen the product of a 'confession' is a misstatement of how the homicide was committed, *it must, by definition, not be a volitional act*." (Emphasis added.) This assertion is untenable as a simple matter of self-evident fact. Defendant is claiming, in essence, that people do not intentionally lie: he is asserting that where a statement is factually inaccurate, it could not have been made on purpose. There is no basis for assuming, out of hand, that an imprecise confession is involuntary. An accused may be willing to admit the bare facts of a crime, but unwilling to confront the unpleasant details. It does not mean that the bare facts are not true.

**{48}** Additionally, it is not definitively clear, as Defendant would have it, that he confessed to something that did not happen. Defendant claims that he described putting a type of choke hold on the Victim, while the Office of the Medical Examiner determined that Victim's death was caused by ligature asphyxiation, as well as by the plastic bag placed over Victim's head.

**{49}** This discussion centers around the following exchange between Agent Henrietta Soland ("HS") and Defendant ("JE"):

> HS: And you, you had your, your arm around her. . .
> JE: I just had my arm just, I was holding her down, I had my arm, I had my arm up like this, okay.
> HS: Like a choke hold?
> JE: Yeah, but I was holding her down. I was sitting on the couch and she was sitting beside me. . .and I was holding her, and all of a sudden I was

---

determine if they were. Agent Ness claimed that police had found Defendant's "biological lipids" on Victim's body—a meaningless phrase which appears to be aimed at evoking DNA evidence. Agent Ness also told Defendant that police had found Defendant's fingerprints on the bag over Victim's head, evidence which does not appear in the affidavit or anywhere else in the record. Agent Ness also strongly implied that Victim's blood was found on Defendant's clothes, another evidentiary claim not supported in the present record. Because this is an interlocutory appeal, there is insufficient evidence in the present record to determine whether these last two claims are true. Although Defendant did not raise this issue before this Court, we note that our Court of Appeals has previously noted that misrepresentations "do not necessarily invalidate a confession." *Lobato*, 2006-NMCA-051, ¶ 13; *see also Frazier v. Cupp*, 394 U.S. 731, 737, 739 (1969) (noting that while it was relevant that police had falsely told the defendant that the co-conspirator had already confessed, such circumstances were "insufficient . . . to make this otherwise voluntary confession inadmissible"). In the event of a conviction, Defendant may raise these and other issues on appeal.

12

closing my eyes and it was like please and she stopped.

**{50}** It is true that Defendant acknowledges the suggestion by Agent Soland that he had her in something "like a choke hold." But his description immediately following that acknowledgment does not sound much "like a choke hold" at all. We are also deprived of whatever gesture Defendant gave when he said he had his arm "up like this." Given the disjointed descriptions that Defendant gave throughout the interrogation, we cannot say definitively that he described killing Victim "accidentally" by "choking her to death with his arm," as Defendant now claims.

**{51}** The Office of the Medical Investigator concluded that Victim died due to asphyxia from ligature strangulation combined with airway obstruction with a plastic bag. The bag around Victim's head, we must note, is fully consistent in the accounts of both Defendant and the medical examiner. The only difference is that the medical examiner concluded that a ligature—a wire, rope, cord or the like—had strangled Victim, while Defendant's account is ambiguous as to how the strangulation happened. Defendant does not mention anywhere using a rope or cord of any sort, except when he described tying the bag around Victim's head.

**{52}** This is not the sort of discrepancy that supports a claim that Defendant confessed to a crime he did not commit. It is, rather, a minor inconsistency. It is possible that this sort of inconsistency suggests that Defendant did not commit the crime, but that is a question ideally suited for a jury to determine. It is not a question we answer at this stage, and it does not render his confession involuntary as a matter of law.

**{53}** Defendant also argues that his confession was involuntary because Agent Ness was "proficient" at interrogation techniques, and because Defendant was in custody at the time of the interrogation. He cites no case, and we find none, holding that the proficiency of an interrogator is more or less likely to render a confession involuntary. As for the proposition that the confession was rendered involuntary because Defendant was in custody, we merely note that Defendant was incarcerated on an unrelated charge, and had been in jail for almost two weeks at the time of his confession. The whole interrogation here lasted some 90 minutes. There are no allegations of food or sleep deprivation, or of any physical violence or threats thereof. There are no allegations of overt threats, and no allegations of overt promises. There can be little doubt that an interrogation inside a jail is inherently more coercive than an interrogation in a suspect's home, but it is not coercive per se.

**{54}** Because we conclude that the September 18 statement was voluntary, we need not address Defendant's argument that the later confession, on September 19 was tainted by the first.

**CONCLUSION**

**{55}** We affirm the district court's decision not to suppress Defendant's confession. We

13

reverse the district court's decision to suppress the physical evidence seized as a result of the search warrant. We remand for further proceedings consistent with this Opinion.

**{56}   IT IS SO ORDERED.**

_____
**RICHARD C. BOSSON, Justice**

**WE CONCUR:**

_____
**EDWARD L. CHÁVEZ, Chief Justice**

_____
**PATRICIO M. SERNA, Justice**

_____
**PETRA JIMENEZ MAES, Justice**

_____
**CHARLES W. DANIELS, Justice**

**Topic Index for *State v. Evans,* No. 30,454 / 30,443**

| **CT** | **Constitutional Law** |
|---|---|
| CT-CF | Confession |

| **CA** | **Criminal Procedure** |
|---|---|
| CA-AW | Affidavit for Search Warrant |
| CA-CF | Confession |
| CA-PA | Probable Cause |
| CA-SZ | Search and Seizure |
| CA-SW | Search Warrant |
| CA-MR | Motion to Suppress |

| **CL** | **Criminal Law** |
|---|---|
| CL-CG | Criminal law, general |
| CL-MU | Murder |

| **EV** | **Evidence** |
|---|---|

14

EV-SU             Suppression of Evidence