**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2013-NMCA-075**

**Filing Date: May 23, 2013**

**Docket No. 30,741**

**STATE OF NEW MEXICO,**

      **Plaintiff-Appellant,**

**v.**

**MISTY LIGHT,**

      **Defendant-Appellee.**

**APPEAL FROM THE DISTRICT COURT OF EDDY COUNTY**
**J. Richard Brown, District Judge**

Gary K. King, Attorney General
Santa Fe, NM
M. Victoria Wilson, Assistant Attorney General
Albuquerque, NM

for Appellant

Gorence & Oliveros, P.C.
Robert J. Gorence
Albuquerque, NM

for Appellee

**OPINION**

**WECHSLER, Judge.**

**{1}**    The State appeals the district court's order granting Defendant Misty Light's motion to suppress. We find no error. The search warrant was impermissibly broad in allowing officers to search "all persons" located on the premises when the only evidence tying Defendant to any crime was her presence at an event that was open to the public where illegal activity was taking place. Finally, the officers were not justified in searching Defendant's purse due to the lack of evidence tying Defendant to the criminal activity taking

1

place on the premises and because the officers knew the purse belonged to Defendant. Accordingly, we affirm the order suppressing the evidence found in Defendant's purse and her subsequent statements to the officers.

## BACKGROUND

**{2}** We summarize the underlying facts in the light most favorable to the district court's ruling. *See State v. Flores*, 2008-NMCA-074, ¶ 2, 144 N.M. 217, 185 P.3d 1067. Initially, we note that the parties stipulated to certain facts based on evidence presented at the suppression hearings in the companion case of *State v. Bradley Light*, CR-20090215. The district court incorporated those facts into its findings in this matter, and the testimony from those hearings is part of the record in this case.

**{3}** Police had been conducting an investigation of Bradley Light (Light), the owner of the Cavern Theater (the theater), for alleged drug trafficking. The officers had information that Light was selling and allowing the use of illegal drugs in the theater. They also had information that Light was hosting circuit or "rave" parties at the theater. At these parties, drugs, primarily ecstasy and marijuana, were being sold and consumed, and underage persons were consuming alcohol.

**{4}** Officer Allen Sanchez, an officer with the Carlsbad Police Department assigned as an agent to the Pecos Valley Drug Task Force, learned that Light would be hosting a rave party at the theater on May 9, 2009. Sanchez arranged for Arturo Holguin, a law enforcement officer working with the Otero County Narcotics Enforcement Unit, to attend the party and report back to Sanchez as to what transpired.

**{5}** Holguin went inside the theater at about 10:15 p.m.; Sanchez parked nearby and observed people entering and leaving the theater between 10:15 p.m. and midnight. At the door of the theater, Holguin was asked for identification to show he was over twenty-one, and he was searched for weapons before being allowed to enter. He was not asked to show an invitation or any other documentation to gain entry.

**{6}** While inside the theater, Holguin observed, among other things, what appeared to be underage people drinking alcohol, people smoking marijuana in the "cry room," and people taking pills. About twenty-five percent of the occupants appeared to be juveniles under the age of eighteen. Holguin approached a male juvenile and two female juveniles, who told him they were taking ecstasy; another person spoke with the male juvenile, and the male juvenile, in turn, informed Holguin that he would have ecstasy for sale later in the night. Holguin was later able to purchase ecstasy from another male, he saw a male selling ecstasy to others, and he was told that marijuana and more ecstasy would be for sale later. Holguin purchased cocaine from a male standing in the lobby.

**{7}** Holguin met Light when Holguin entered the theater. Later, Light was passing around syringes containing a red jello-like substance that Holguin heard Light confirm were

"jello shots." Holguin knew by training or experience that a jello shot is a mixture of some sort of alcohol and jello.

**{8}** Someone told Holguin that Light called ecstasy "party favors." Holguin asked Light for party favors, but Light told him that he was having other people pass them out, although Light later gave Holguin five pills that Holguin knew to be ecstasy.

**{9}** Throughout his time in the theater, Holguin reported his observations by text messages to Sanchez, who remained waiting outside. Other than identifying Light and three other males by name, Holguin gave no description of any of the people he observed except to classify them as male or female and as juvenile.

**{10}** Around midnight, Sanchez decided that he had probable cause for a warrant to search the theater, and he left the parking lot to meet with agents from the Carlsbad Police Department and the Eddy County Sheriff's Department to brief them on the situation. Sanchez sought permission to call out the Carlsbad Police Department Special Response Team (SRT), and he requested that officers from the Eddy County Sheriff's Department seek permission to use that Department's Tactical Response Team (TRT).

**{11}** Once the SRT and TRT members arrived, Sanchez briefed the officers as to what Holguin had told him, and he told the officers that they were to enter the theater to secure the building, but they were not to search any person or vehicle until he returned with a warrant. At some point between midnight and 1:00 a.m. on May 10, 2009, approximately fifteen officers secured the theater and held all the occupants, approximately seventy-five to one hundred people, for the next two-and-a-half hours waiting for Sanchez to return with the search warrant. The officers saw drugs on the floor, but they made no effort to collect them, and Sanchez received no information as to what transpired once the SRT and TRT agents entered the building.

**{12}** The officers ensured that all the occupants remained seated and did not allow anyone to leave until Sanchez arrived with the search warrant about 2:40 a.m. The district court erroneously found that the warrant was executed at 3:30 a.m., but this error is harmless because it had no impact on the district court's conclusions of law. *See State v. Fernandez*, 117 N.M. 673, 676, 875 P.2d 1104, 1107 (Ct. App. 1994) ("In the absence of prejudice, there is no reversible error.").

**{13}** The search warrant authorized a search of Light, his residence, the theater, any vehicles found on those properties, and "[a]ny persons found on the properties listed above." It authorized officers to seize "[e]cstacy pills in any shape, form, or size[, and c]ocaine, marijuana, and drug paraphernalia [and p]lastic syringes without needles which contained a red jello type substance."

**{14}** In executing the warrant, the officers lined all the occupants into two rows and searched each person individually along with any property in their possession. Occupants

3

were then allowed to leave if no contraband was found.

**{15}** Defendant was present in the front of the theater when the officers arrived to secure the premises. She was searched at approximately 4:05 a.m. There was no testimony that officers found any evidence of illegal drugs or other contraband on Defendant's person, and there was nothing to suggest that Defendant appeared intoxicated or under the influence of drugs.

**{16}** Defendant sought to leave, and she approached Officer Daniel Vasquez, one of the officers who had helped to secure the perimeter when the officers initially entered the theater. Defendant told Vasquez that she needed her purse and jacket, which were stored in the theater's storage room. Vasquez told Defendant that these items would have to be searched before she could leave with them, and Defendant acquiesced. The parties stipulate that Defendant did not consent to the search of her person or property.

**{17}** Inside Defendant's purse, Vasquez found a small metal container containing methamphetamine. Vasquez testified that before he opened the purse and container, he had no particularized suspicion that the purse contained contraband, that the purse had no odors and, after opening it, that he saw no obvious evidence of contraband or observed anything suspicious about the metal container.

**{18}** Defendant was charged with one count of possession of methamphetamine and moved to suppress the evidence. *See* NMSA 1978, § 30-31-23(D) (2011). After considering the State's response and conducting a hearing, the district court entered conclusions that: (1) notwithstanding the search warrant's authorization to search "all persons," the State was required to show probable cause based on a particularized suspicion that Defendant was engaged in criminal activity or possessed contraband, and the State failed to do so; (2) the State failed to justify detaining Defendant for approximately two-and-a-half to three hours while Sanchez obtained the warrant and while the officers executed the warrant; and (3) the search of Defendant's purse was not covered by the search warrant, and the State failed to present probable cause based on particularized suspicion to search Defendant's purse. The district court then granted Defendant's motion to suppress, stating that: (1) the detention was unlawful such that any subsequent search was also unlawful; (2) even if the detention was reasonable, the State failed to show particularized suspicion that Defendant was engaged in any criminal activity, and thus the search of her person and property were unlawful; and (3) Vasquez knew the purse belonged to Defendant and was not part of the theater's property and, therefore, the search of the purse was not authorized by the warrant, and the State failed to show particularized suspicion justifying the search. The State appeals.

**STANDARD OF REVIEW**

**{19}** We review the order granting Defendant's motion to suppress as a mixed question of fact and law. *See State v. Williams*, 2011-NMSC-026, ¶ 8, 149 N.M. 729, 255 P.3d 307. We determine whether the law was correctly applied to the facts and view "the facts in the

4

light most favorable to the prevailing party." *State v. Cline*, 1998-NMCA-154, ¶ 6, 126 N.M. 77, 966 P.2d 785. While deferring to the district court with respect to factual findings and indulging in all reasonable inferences in support of that court's decision, we nonetheless "review the constitutional question of the reasonableness of a search and seizure de novo." *State v. Johnson*, 2006-NMSC-049, ¶ 9, 140 N.M. 653, 146 P.3d 298.

**THE SEARCH WARRANT**

**{20}** In order to search Defendant, officers needed a valid warrant or they needed to be acting "pursuant to one of the recognized exceptions to the warrant requirement." *State v. Hamilton*, 2012-NMCA-115, ¶ 13, 290 P.3d 271. A valid search warrant will only issue upon a showing of probable cause to believe that a crime has been committed and that evidence of a crime will be found in the place or on the person to be searched. *See State v. Evans*, 2009-NMSC-027, ¶ 10, 146 N.M. 319, 210 P.3d 216.

**{21}** "There are no bright-line, hard-and-fast rules for determining probable cause, but the degree of proof necessary to establish probable cause is more than a suspicion or possibility but less than a certainty of proof." *Id.* ¶ 11 (internal quotation marks and citation omitted). "A reviewing court should not substitute its judgment for that of the issuing court [but instead should] determine whether the affidavit as a whole, and the reasonable inferences that may be drawn therefrom, provide a substantial basis for determining that there is probable cause to believe that a search will uncover evidence of wrongdoing." *State v. Williamson*, 2009-NMSC-039, ¶ 29, 146 N.M. 488, 212 P.3d 376. "[T]he substantial basis standard of review is more deferential than the de novo review applied to questions of law, but less deferential than the substantial evidence standard applied to questions of fact." *Id.* ¶ 30.

**{22}** The affidavit in support of the warrant must also state with particularity the place to be searched and the items to be seized. *See* U.S. Const. amend. IV (providing in part that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized"); *State v. Jones*, 107 N.M. 503, 504, 760 P.2d 796, 797 (Ct. App. 1988) (same). The purpose of the particularity requirement is to prevent general searches. *Maryland v. Garrison*, 480 U.S. 79, 84 (1987) (recognizing that the particularity requirement "ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit"); *see Jones*, 107 N.M. at 504, 760 P.2d at 797 (recognizing that the Fourth Amendment's requirement of particularity is to prevent general, exploratory searches).

**{23}** The parties agree that there was probable cause to search Light and that the officers were justified in entering the theater and searching the premises for evidence of ecstasy pills, cocaine, marijuana, drug paraphernalia, and jello shots pursuant to the search warrant. *See, e.g.*, *Evans*, 2009-NMSC-027, ¶ 10. However, in order to establish the requisite probable cause to justify searching Defendant, the State was required to show a particularized

5

suspicion as to her. *See Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) ("Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person."). The parties disagree as to whether the affidavit established the requisite particularized suspicion as to Defendant. *See id.*

**{24}** Defendant appears to suggest that the warrant was invalid as applied to her because an "all persons" warrant is per se invalid as an impermissible general warrant. *Cf. Jones*, 107 N.M. at 504, 760 P.2d at 797 (recognizing that "[t]he [F]ourth [A]mendment . . . prohibits states from using general search warrants that do not describe with particularity the things to be seized"); *Wilson v. State*, 221 S.E.2d 62, 63 (Ga. Ct. App. 1975) (holding that a warrant authorizing the search of a bar and "all persons on the premises" was void as a general warrant). This position has been adopted by a minority of courts that have considered the issue. *Cf. Owens ex rel. Owens v. Lott*, 372 F.3d 267, 274-75 (4th Cir. 2004) (recognizing that under the minority view, an all persons warrant is per se invalid because it fails to identify the persons to be searched with sufficient particularity).

**{25}** The State urges this Court to adopt the majority position, which is that an "all persons" warrant is valid as along as it is supported by probable cause that "any and all persons on the premises are either engaged in criminal activity or possess any of the evidence sought in the search[.]" *See id.* at 275 (recognizing that a majority of courts considering the issue have adopted the view that an "all persons" warrant "is valid as long as there is probable cause to believe that *everyone* found on the premises being searched is involved in the illegal activity and that evidence of the crime would be found on their person"). Pursuant to this standard, the warrant would validly authorize the search of all persons found at the theater, including Defendant, if the supporting affidavit established probable cause to believe that every person found on the premises was involved in the criminal activity or was in possession of contraband. *See id.*

**{26}** We need not decide whether "all persons" warrants are per se invalid because, even applying the majority rule that recognizes the validity of such warrants in some situations, the circumstances in this case do not justify a warrant authorizing the search of all persons found at the theater or, specifically, the search of Defendant. Instead, the "all persons" warrant was not supported by probable cause because there is nothing in the affidavit tying *every* person found in the theater to the criminal behavior taking place there. *See id.* at 276 (holding that the affidavit did not supply sufficient information to establish probable cause when the justification was the officer's statement that, based on his experience in drug enforcement, people present at the scene when illegal drugs are being distributed are usually in possession of drugs); *State v. Garcia*, 166 P.3d 848, 855-56 (Wash. Ct. App. 2007) (holding that the language in the warrant authorizing the search of "any and all persons present" did not authorize the search of all of the occupants found in a motel room because there was "nothing to establish individualized probable cause for 'any and all' of the persons who may have been present in the motel room where drug activity was suspected to occur"). To the contrary, Holguin never identified or described most of the occupants, and he never reported even seeing Defendant. *Cf. People v. Nieves*, 330 N.E.2d 26, 34 (N.Y. 1975)

(holding that an "all persons" warrant "must establish probable cause to believe that the premises are confined to ongoing illegal activity" and that all persons subject to the warrant possess the articles sought and that if "this probability is not present, then each person subject to search must be identified in the warrant . . . by name or sufficient personal description").

**{27}** In claiming that the affidavit established probable cause to believe that any person present at the rave was likely to be involved in criminal activity, the State relies on the evidence concerning the distribution and use of drugs and the consumption of alcohol by underage persons throughout the theater, all of which Holguin observed. It then argues that any person present would be aware of these illegal activities and that it was "highly probable" any person present would be participating in at least some of the illegal activities.

**{28}** We disagree because Holguin's general observations of criminal activity taking place in the theater are only sufficient to establish "[a] generalized belief that all persons present in a location are involved in criminal activity." *Garcia*, 166 P.3d at 855. This belief "is insufficient to establish the required nexus" between Defendant and the criminal activity. *Id.* (holding that "[a] sufficient nexus is not established merely through evidence that some of the persons gathered in a particular location are engaged in criminal activity").

**{29}** Finally, we note that "all persons" warrants authorizing the search of a public place have usually been declared invalid due to the absence of probable cause to believe that all persons present in the establishment were involved in the criminal activity. *See, e.g.*, *State v. Thomas*, 540 N.W.2d 658, 665-66 (Iowa 1995) (holding that there was not probable cause for the warrant to search all persons present in the bar even though the affidavit provided information that the bar had been the site of numerous controlled buys of crack cocaine and numerous arrests involving many people); *State v. Robinson*, 371 N.W.2d 624, 625-26 (Minn. Ct. App. 1985) (striking down a warrant that authorized a drug search of a legally-operating bar and "all persons on the premises" that was executed during normal operating hours with fifty to eighty patrons present); *State v. Sims*, 382 A.2d 638, 645-46 (N.J. 1978) (holding that a warrant that authorized the search of a service station and all persons found therein was void as to the search of the persons found at the station). Courts have observed that a public location, such as a theater, is more likely than a private residence to contain innocent persons who are unrelated to, and perhaps even unaware of, the criminal activity. *See Sutton v. State*, 738 A.2d 286, 294 (Md. Ct. Spec. App. 1999) (observing that courts often recognize that an "all persons" search of a private dwelling is much less likely to entrap innocent persons than the search of a public or semi-public building or location); *See also State v. Kinney*, 698 N.E.2d 49, 54 (Ohio 1998) (recognizing that in general, "[t]he more public a place, the less likely a search of all persons will be sustained" (internal quotation marks and citation omitted)).

**{30}** The State seeks to distinguish these cases because even though patrons of a bar or other public venue may gather for purposes other than illegal activities, the purpose of the rave is only to promote illegal drug and alcohol use. It contends that a person who

7

inadvertently entered the theater with no intention of participating in illegal activity would have left after discovering the illegal activity.

**{31}** We are unpersuaded by the State's argument because there is nothing in the affidavit indicating that the only purpose of the rave was to engage in illegal behavior. Instead, the rave took place in a public theater that anyone could enter, including Holguin who was admitted without any invitation or specialized showing. Given that completely innocent people could enter the theater, we are not convinced that the affidavit contained sufficient information to establish probable cause that every person present was engaged in criminal activity. *See Thomas*, 540 N.W.2d at 665-66 (holding that the "all persons" warrant was invalid despite the information in the affidavit regarding numerous drug transactions and indicating that the bar was a focal point of drug activity in the neighborhood because an innocent person could have inadvertently entered the bar and thus the magistrate had no way of knowing whether every person was involved in criminal activity).

**{32}** Based upon the foregoing, we affirm the district court's conclusion that the "all persons" warrant impermissibly authorized the search of Defendant's person because it was not supported by information in the affidavit establishing a particularized suspicion that Defendant or "all persons" found on the premises were involved in criminal activity or in possession of contraband.

## SEARCH OF DEFENDANT'S PURSE

**{33}** The State claims that even if the search of Defendant's person was unlawful, the officers were nonetheless entitled to search Defendant's purse because it was located on the premises to be searched. New Mexico appellate courts have yet to specifically address the question of whether a container or personal property belonging to a visitor but found on the premises to be searched is considered to be part of the premises or whether it is an extension of its owner. Thus, we look to the approach taken in other jurisdictions for guidance on this issue.

**{34}** Some courts apply a "physical possession" test and focus on whether the visitor had the container or personal property in his or her physical possession at the time of the search. *See, e.g.*, *United States v. Johnson*, 475 F.2d 977, 979 (D.C. Cir. 1973) (holding that the search of the visitor's purse was covered by the warrant because it was not being worn by the visitor and thus did not constitute "an extension of her person so as to make the search one of her *person*"); *State v. Reid*, 77 P.3d 1134, 1136-43 (Or. Ct. App. 2003) (criticizing, but nonetheless adopting, the bright-line physical possession test and thus holding that, if the personal property is on the premises but not within the visitor's physical possession and it could contain an item named in the warrant, officers may search it even if they know the property belongs to the visitor). We decline to adopt the physical possession approach because it insulates guilty parties who could evade detection by giving contraband to visitors. *See United States v. Micheli*, 487 F.2d 429, 431 (1st Cir. 1973) ("It is too broad in that a search warrant could be frustrated to the extent that there are hands inside the premises

8

to pick up objects before the door is opened by the police."). Furthermore, it fails to protect the privacy interests of visitors who merely put down or store their personal effects for purposes of convenience or in order to comply with the requirements of certain public venues. *See id.* (criticizing the physical possession approach as too narrow because "it would leave vulnerable many personal effects, such as wallets, purses, cases, or overcoats, which are often set down upon chairs or counters, hung on racks, or checked for convenient storage").

**{35}** Defendant encourages us to adopt the "notice" approach that prohibits officers from searching the personal property of visitors on the premises to be searched if the officers knew or should have known that the personal property belonged to the visitor. *See State v. Lohr*, 263 P.3d 1287, 1291-92 (Wash. Ct. App. 2011) (holding that the warrant to search the premises did not cover the defendant's purse that "was readily recognizable as her personal effect" and noting that "if an item is readily recognizable as belonging to an individual not named in the warrant, the item is not within the warrant's scope"); *cf. Waters v. State*, 924 P.2d 437, 440 (Alaska Ct. App. 1996) (assuming for purposes of the decision that personal property belonging to a visitor is exempt from the warrant "if the officers knew or reasonably should have known" that the property does not belong on the premises but nonetheless affirming the search of the defendant's purse because ownership of the purse was ambiguous).

**{36}** The district court appeared to adopt the notice approach in reaching its determination that Vasquez was not justified in searching Defendant's purse because the purse clearly belonged to her. We need not decide if the district court was correct in determining that Vasquez was precluded from searching Defendant's purse merely based on his knowledge that it belonged to Defendant because the district court's determination is justified on other grounds as well. *See State v. Ruiz*, 2007-NMCA-014, ¶ 38, 141 N.M. 53, 150 P.3d 1003 (holding that, as a general rule, "we will uphold the decision of a district court if it is right for any reason").

**{37}** A number of jurisdictions have applied an approach that considers the connection between the visitor, the visitor's personal property, and the reason for the search warrant. For example, the "relationship approach" adopted by the court in *Micheli* requires an examination of "the relationship between the person and the place." *See Micheli*, 487 F.2d at 431; *see also United States v. Giwa*, 831 F.2d 538, 544-45 (5th Cir. 1987) (stating that "physical possession should not be the sole criterion . . . used to determine whether a personal item may be searched pursuant to a premises search warrant[,]" but instead the better approach is to examine the "relationship between the person and the place"). This approach recognizes that items found on the premises will not automatically fall within the proper scope of the search warrant, but instead, "it is necessary to examine why a person's belongings happen to be on the premises." *Micheli*, 487 F.2d at 432 (holding that the search of the defendant's briefcase fell within the scope of the warrant to search the premises because the defendant, a co-owner of the premises searched, was not a mere visitor but instead "had a special relation to the place, which meant that it could reasonably be expected

that some of his personal belongings would be there").

**{38}** In *State v. Jackson*, 260 P.3d 1240, 1243-44 (Kan. Ct. App. 2011), the Kansas Court of Appeals adopted a hybrid approach that it characterized as a "notice test" with a relationship exception. Under this approach, officers may not search a visitor's personal property if they have "actual or reasonable constructive notice" that the property is not subject to the warrant. *Id.* However, the relationship exception will apply to allow the search, despite the officer's notice of ownership, if the surrounding circumstances suggest that the visitor has more than a casual relationship to the premises and that there is a relationship between the visitor and the "illegal activities described in the warrant." *Id.* at 1244.

**{39}** In *Jackson*, the officers executed a search warrant authorizing a search for illegal drugs and paraphernalia at the residence of Marla Davenport. *Id.* at 1242. Davenport, her son, and five non-residents, including the defendant, were found in the bedroom, but the officers found three or four purses on the floor in the kitchen. *Id.* When the officers looked inside of the purses, ostensibly to determine ownership, they found drug paraphernalia inside the defendant's purse along with methamphetamine. *Id.* at 1242-43. Because the officers knew or should have known that the purse belonged to the defendant *and* because there was no suggestion that the defendant either lived on the premises or was engaged in the illegal activity, the court held that the search warrant did not authorize the search of her purse. *Id.* at 1244-47.

**{40}** The underlying rationale of the notice approach, the relationship approach adopted in *Micheli*, or the hybrid approach adopted by the court in *Jackson*, and our consideration of the lack of evidence connecting Defendant to the criminal activities, lead us to conclude that the search of Defendant's purse was impermissible. *See id.*; *see also United States v. Young*, 909 F.2d 442, 445 (11th Cir. 1990) (recognizing that application of the "relationship" test is consistent with the Supreme Court's holding in *Ybarra* because it was the patron's lack of a relationship with the illegal activity taking place on the premises that resulted in a finding of lack of probable cause in *Ybarra*). Moreover, even though New Mexico appellate courts have yet to consider this precise issue, this Court's opinion in *State v. Gurule*, 2011-NMCA-063, 150 N.M. 49, 256 P.3d 992, *cert. granted*, 2011-NMCERT-006, 150 N.M. 764, 266 P.3d 633, is consistent with the views articulated by the courts in *Jackson* and *Micheli*, by implicitly recognizing the need to establish a connection between the specific item seized and the reason for the warrant. *See Gurule*, 2011-NMCA-063, ¶ 16 (recognizing that "the scope of the [search] warrant [must] be limited by the probable cause on which the warrant is based" and that courts will suppress the seizure of an *individual item* for lack of probable cause with respect to that item (internal quotation marks and citation omitted)).

**{41}** In *Gurule*, the search warrant was based on information in the affidavit that computers in the defendant's home were being used to view and share child pornography. *Id.* ¶¶ 2, 5. There was nothing in the affidavit indicating that cameras in the home were

being used in connection with the pornography or that anyone in the home was taking pornographic pictures. *Id.* ¶ 5. The search warrant authorized the seizure of a digital camera. *Id.* ¶ 2.

**{42}** This Court affirmed the district court's order suppressing evidence obtained from the digital camera because, even though the search warrant explicitly authorized the search and seizure of the digital camera,"the dispositive issue is whether there was probable cause to permit the search of the camera." *Id.* ¶¶ 20, 23. In the absence of any showing that the digital camera was being used to store or to manufacture the child pornography, this Court held that "there was no substantial basis for concluding that there was probable cause that the camera would contain child pornography," and the evidence found therein was properly suppressed. *Id.* Applying the analysis of *Gurule* leads us to conclude that the search of Defendant's purse was not supported by probable cause because the State failed to prove that the seizure of that individual item was supported by probable cause and it failed to establish a connection between the purse and the reason for the warrant. *See id.* ¶ 16.

**{43}** Finally, contrary to the State's contentions, we believe the United States Supreme Court's decisions in *United States v. Ross*, 456 U.S. 798 (1982), and *Wyoming v. Houghton*, 526 U.S. 295 (1999), can be reconciled with the approach taken by the courts in *Jackson* and *Micheli*. The State relies on language in *Ross* stating that "[a] lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search." 456 U.S. at 820-21; *see Houghton*, 526 U.S. at 301-02 (applying *Ross* to conclude that, when there is probable cause to search an automobile, the officers may search containers found within the automobile regardless of ownership and without the need for "individualized probable cause" for each container).

**{44}** However, the State acknowledges that both *Ross* and *Houghton* involve the warrantless search of automobiles under the federal automobile exception. *See Houghton*, 526 U.S. at 303; *Ross*, 456 U.S. at 800-01. The automobile exception is justified in part by the recognition that passengers, as well as drivers, "possess a reduced expectation of privacy with regard to the property that they transport in cars." *Houghton*, 526 U.S. at 303.

**{45}** We do not believe that the principles underlying *Ross* and *Houghton* apply in this matter because neither case involves the search of the personal property of a person who is not subject to the search warrant and who has stored his or her property on premises that are open to the public. Therefore, we are not persuaded that these cases warrant a conclusion that the search of Defendant's purse was supported by probable cause or that the search was authorized by the warrant to search the premises of the theater.

**{46}** In sum, the district court found that Vasquez knew the purse belonged to Defendant at the time he conducted the search. There is nothing in the affidavit or in the officers' testimony to suggest that the purse was connected to the theater or to the illegal activity occurring there. Therefore, Vasquez was not authorized to search Defendant's purse and the

11

evidence found therein, and Defendant's subsequent statements about that evidence were properly suppressed.

**NEW MEXICO CONSTITUTION**

**{47}**    Because we find that the search of Defendant's person and her personal belongings violated the Fourth Amendment of the United States Constitution, we need not decide whether it violated Article II, Section 10 of the New Mexico Constitution as well or whether Defendant preserved her claim under the New Mexico Constitution. *See State v. Montano*, 2009-NMCA-130, ¶ 23, 147 N.M. 379, 223 P.3d 376.

**CONCLUSION**

**{48}**    For these reasons, we affirm the order of the district court.

**{49}    IT IS SO ORDERED.**

_____
**JAMES J. WECHSLER, Judge**

**WE CONCUR:**

_____
**CYNTHIA A. FRY, Judge**

_____
**LINDA M. VANZI, Judge**

**Topic Index for *State v. Light*, No. 30,741**

**APPEAL AND ERROR**
Harmless Error
Standard of Review

**CONSTITUTIONAL LAW**
Fourth Amendment
Suppression of Evidence

**CRIMINAL LAW**
Controlled Substances

**CRIMINAL PROCEDURE**
Affidavit for Warrant
Motion to Suppress

12

Notice
Search and Seizure
Warrant
Warrantless Search

**EVIDENCE**
Suppression of Evidence