This decision was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of non-precedential dispositions. Please also note that this electronic decision may contain computer-generated errors or other deviations from the official paper version filed by the Supreme Court.

## IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Filing Date:   April 13, 2015**

**STATE OF NEW MEXICO,**

     Plaintiff-Appellee,

v.                                  **NO. 34,025**

**JUSTIN JOHN MARK,**

     Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF SAN JUAN COUNTY**
**John A. Dean, Jr., District Judge**

Robert E. Tangora, L.L.C.
Robert E. Tangora
Santa Fe, NM

for Appellant

Hector H. Balderas, Attorney General
Sri Mullis, Assistant Attorney General
Santa Fe, NM

for Appellee

## DECISION

**VIGIL, Chief Justice.**

{1} Defendant Justin Mark, convicted by a jury of first-degree murder and tampering with evidence, raises five issues on direct appeal to this Court: (1) the district court violated Defendant's right to confront witnesses against him, (2) the district court erred by concluding that Defendant's statements to police were voluntarily made, (3) the district court erred by instructing the jury on alternate theories of first-degree murder, (4) there was insufficient evidence to support the jury's verdicts, and (5) the district court's errors taken together constitute cumulative error. We are not persuaded by any of Defendant's arguments. We affirm Defendant's convictions in this unpublished decision because Defendant raises no novel issues that are not already addressed sufficiently in New Mexico precedents. *See* Rule 12-405(B) NMRA.

## I.    BACKGROUND

{2} Defendant's convictions arose from a May 29, 2011, incident that resulted in the killing of Kevin Lossiah in his own home. At around 11:30 that morning, the couple who lived in the duplex apartment next door to Lossiah, Nicole and Wesley, were at home cooking breakfast when Nicole saw a person's shadow pass the window. Wesley went out the back door and found a person standing outside, who told Wesley his name was Donovan King. King showed Wesley a red MP3 player, and Wesley went back inside. A little while later, Wesley made another trip outside and saw

Defendant standing with King. About ten or fifteen minutes after Wesley saw Defendant and King behind the duplex, Wesley and Nicole heard a loud thud and banging coming from Lossiah's apartment. Nicole heard someone yell, "Please stop, no more!" Wesley and Nicole called 911.

{3}     Police officers were dispatched to Lossiah's apartment at about 12:23 that afternoon. Officer Mark Norwood, the first officer on the scene, knocked on the front door of the apartment, but no one answered. Officer Norwood walked around to the back of the apartment and pushed open the back door. He saw Lossiah lying on the living room floor, covered in blood and bleeding profusely from severe head injuries. Officer Norwood also noticed a large amount of blood on the floor and blood splatter on the walls, ceiling, and furniture. Realizing the severity of Lossiah's injuries, Officer Norwood called paramedics and attempted to keep Lossiah calm while awaiting their arrival.

{4}     Lossiah was still alive when paramedics arrived. Lossiah pleaded for help but became increasingly combative and incomprehensible as he continued to bleed from his head wounds. A paramedic testified at trial that Lossiah's head injuries were so severe that she could see portions of his brain. Lossiah also suffered major injuries to his face and bruising on his torso. Paramedics transported Lossiah to the hospital, where he died about twelve hours later.

3

{5} Meanwhile, Detective Paul Martinez was en route to Lossiah's apartment when he saw two men walking down the sidewalk who matched the description of the suspects. Detective Martinez described the men as disheveled, wet, and muddy. Detective Martinez stopped the men, and they reluctantly identified themselves as Defendant and King. Detective Martinez testified at trial that Defendant and King appeared to be intoxicated, but spoke coherently and answered questions in a linear manner. Both Defendant and King had blood on their skin and clothing. Defendant was not wearing a shirt but carried a blood-stained sweatshirt. Defendant had light scratches on his back and shoulders that were consistent with running through weeds or brush. Defendant also wore three socks, including a pair of black socks and one white sock.

{6} Lab testing later confirmed that Defendant had blood on his hands and boots. The blood on the sweatshirt that Defendant had been carrying tested positive for Lossiah's DNA. A single white sock found on Lossiah's couch had blood stains matching Lossiah's DNA, and the sole of the sock tested positive for Defendant's DNA. Lossiah's DNA was also found on King's pants.

{7} Officers took Defendant and King to the police station for further questioning. While patting down Defendant and King prior to taking them into custody, officers discovered that both men possessed a set of keys to Lossiah's vehicle. King also had

4

Lossiah's cell phone and a red MP3 player.

{8}     Officers later searched the area near Lossiah's home. Relying on statements Defendant made while in custody, officers located Lossiah's wallet under a piece of sheet metal and a smashed vodka bottle near the wallet. Officers also recovered a wooden club from an irrigation ditch in a wooded area nearby. The club was two and one-half feet long, two or three inches wide, and had blood and hair on it. The hair later tested positive for Lossiah's DNA. The wood of the club matched the wood from tree limbs located in a brush pile a few yards from Lossiah's back door.

{9}     On July 1, 2011, the State charged Defendant with an open count of first-degree murder, an open count of conspiracy to commit first-degree murder, armed robbery, conspiracy to commit armed robbery, aggravated burglary, conspiracy to commit aggravated burglary, and tampering with evidence. At trial, the district court instructed the jury on two alternative theories of first-degree murder, deliberate intent murder and felony murder. The district court also instructed the jury on two potential predicate felonies for the felony murder alternative, armed robbery and aggravated burglary. The jury found Defendant guilty of first-degree murder—without specifying the theory upon which the verdict was based—and one of the potential predicate felonies, armed robbery. The jury also found Defendant guilty of conspiracy to commit armed robbery and tampering with evidence.

5

{10} Following Defendant's trial, the district court entered the jury verdicts and convicted Defendant of first-degree murder, armed robbery, conspiracy to commit armed robbery, and tampering with evidence. At sentencing, however, the prosecution and defense stipulated that both the armed robbery conviction and the conspiracy to commit armed robbery conviction should "merge into" the first-degree murder conviction. Pursuant to this stipulation, the district court did not enter a judgment or sentence on either the armed robbery conviction or the conspiracy to commit armed robbery conviction. The district court sentenced Defendant to life imprisonment for first-degree murder plus three years for tampering with evidence, to be served consecutively. Defendant appealed directly to this Court. *See* N.M. Const. art. VI, § 2 ("Appeals from a judgment of the district court imposing a sentence of death or life imprisonment shall be taken directly to the supreme court."). *Accord* Rule 12-102(A)(1) NMRA. Further facts and proceedings will be developed as needed in the following discussion.

## II.   DISCUSSION

**A.   Defendant's Confrontation Rights Were Not Violated When a Forensic Pathologist, Who Did Not Perform the Autopsy, Provided His Own Independent Opinions Regarding the Cause and Manner of Lossiah's Death**

{11} At trial the State called Dr. Ross Zumwalt, the Chief Medical Investigator for

6

the State of New Mexico, to testify about the cause and manner of Lossiah's death. Defendant objected to Dr. Zumwalt's testimony on the ground that Dr. Zumwalt did not perform Lossiah's autopsy. The prosecutor responded that Dr. Zumwalt would testify regarding his own opinions and that the autopsy report would not be admitted into evidence. The district court permitted Dr. Zumwalt to testify and accepted him as an expert witness in forensic pathology.

{12}    Dr. Zumwalt testified that he "reviewed the information . . . surrounding the circumstances of the death and reviewed the autopsy photographs" to formulate his opinions regarding the cause and manner of Lossiah's death. Dr. Zumwalt referred to various photographs during his testimony, and the district court admitted these photographs into evidence without objection. Dr. Zumwalt testified that Lossiah sustained fractures of the skull, bleeding in and around the brain, and brain swelling. Dr. Zumwalt concluded that Lossiah died from blunt force injuries to the head. Dr. Zumwalt also testified that injuries on the left side of Lossiah's chest were consistent with a series of impacts from a long, narrow object, like a rod, and that Lossiah had a bruised forearm and a deformed index finger, which may have been broken.

{13}    On appeal, Defendant argues that the district court violated Defendant's right to confront witnesses against him by allowing Dr. Zumwalt to testify about an autopsy he did not perform. The State argues that the admission of Dr. Zumwalt's testimony

did not violate Defendant's confrontation rights because Dr. Zumwalt gave his own, independent opinions about Lossiah's cause of death, based on his review of the photographs, and did not repeat any opinions or statements from the pathologist who performed the autopsy. "This Court reviews claimed violations of the Confrontation Clause de novo." *State v. Sisneros*, 2013-NMSC-049, ¶ 9, 314 P.3d 665.

{14} "The Confrontation Clause guarantees the accused in a criminal trial the right 'to be confronted with the witnesses against him.'" *State v. Mendez*, 2010-NMSC-044, ¶ 28, 148 N.M. 761, 242 P.3d 328 (quoting U.S. Const. amend. VI). The Confrontation Clause precludes the State from introducing into evidence "an out-of-court statement that is both testimonial and offered to prove the truth of the matter asserted . . . unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant." *State v. Navarette*, 2013-NMSC-003, ¶ 7, 294 P.3d 435.

{15} Evaluating Defendant's claim requires us to consider whether the State introduced, through the testimony of Dr. Zumwalt, any testimonial, out-of-court statements made by the forensic pathologist who performed the autopsy. In *Navarette*, this Court explained that the subjective statements included in an autopsy report regarding a violent death are testimonial because a forensic pathologist who works for the medical examiner has a statutory duty to report suspicious deaths and should

8

anticipate that the report may be used in a criminal prosecution. *Id.* ¶¶ 16-17. Accordingly, the State cannot introduce into evidence an autopsy report containing testimonial statements made by a non-testifying pathologist without violating the defendant's confrontation rights. *See State v. Jaramillo*, 2012-NMCA-029, ¶ 1, 272 P.3d 682. Likewise, permitting a forensic pathologist who did not perform the autopsy to testify at trial regarding "the opinion or subjective statement of the pathologist who performed the autopsy" violates the defendant's confrontation rights. *Navarette*, 2013-NMSC-003, ¶ 22. On the other hand, some of the material contained in an autopsy file is not testimonial and therefore may be admissible at trial. *Id.* For example, experts in forensic pathology may offer independent opinions regarding their interpretations of raw data contained in autopsy files, such as autopsy photographs, without violating the defendant's confrontation rights. *Id.*

{16}     In this case, we conclude that the State did not introduce any testimonial, out-of-court statements against Defendant. Dr. Zumwalt relied on raw data, the autopsy photographs, to arrive at his own independent opinions about Lossiah's injuries and the cause and manner of Lossiah's death. Dr. Zumwalt did not repeat any subjective observations made by the pathologist who performed the autopsy. Although Dr. Zumwalt admitted on cross-examination that he reviewed "the entire file" in preparation for his testimony, he neither referred to nor quoted from the autopsy report

9

while testifying, and the State did not proffer the autopsy report as evidence. We hold that the introduction of Dr. Zumwalt's testimony at trial did not violate Defendant's confrontation rights.

**B.     The District Court Properly Denied Defendant's Motion to Suppress the Physical Evidence Obtained by Virtue of Defendant's Voluntary Statements to Police**

{17}     Although Defendant never waived his *Miranda* rights, he made statements to police that helped them recover physical evidence. Prior to trial, the district court suppressed Defendant's statements but not the physical evidence obtained as a result of those statements. On appeal, Defendant argues under *State v. Franklin*, 1967-NMSC-151, 78 N.M. 127, 428 P.2d 982, and *State v. Boyer*, 1985-NMCA-029, 103 N.M. 655, 712 P.2d 1, that the district court erred by concluding that Defendant's statements to police were voluntary and by denying Defendant's motion to suppress the physical evidence. The State asserts that the district court properly admitted the physical evidence because Defendant's statements were made voluntarily.

{18}     The United States Constitution does not require the suppression of physical evidence obtained by virtue of a defendant's voluntary statements, even if those statements were obtained without a valid waiver of the defendant's *Miranda* rights.[1]

---

[1]We analyze this issue solely as a matter of federal law because Defendant does not assert that Article II, Section 18 of the New Mexico Constitution should be

10

*See State v. Adame*, 2006-NMCA-100, ¶¶ 9-14, 140 N.M. 258, 142 P.3d 26 (adopting the United States Supreme Court's holding in *United States v. Patane*, 542 U.S. 630, 633-34 (2004), "that the failure to give *Miranda* warnings [does] not require suppression of evidence that [is] the fruit of a suspect's unwarned but voluntary statements"); *see also State v. Olivas*, 2011-NMCA-030, ¶¶ 18-20, 149 N.M. 498, 252 P.3d 722 (admitting physical evidence obtained as a result of the defendant's voluntary statements even though officers failed to advise the defendant of his *Miranda* rights). Thus, the issue on appeal is whether Defendant's statements were voluntary.

{19}     Defendant made the statements during an interrogation at the police station, after Defendant was arrested near the scene of Lossiah's murder. Officers placed Defendant in a room with two chairs and a table, removed Defendant's handcuffs, and kept the door unlocked while several officers came and went. A few minutes later, Detective Daven Bedoni came in and told Defendant that he was going to explain Defendant's rights and ask Defendant some questions. Detective Bedoni emphasized that it was up to Defendant to decide whether to talk. Detective Bedoni read

---

interpreted more broadly than the Fourteenth Amendment to the United States Constitution. *See State v. Munoz*, 1998-NMSC-048, ¶ 20 n.1, 126 N.M. 535, 972 P.2d 847.

Defendant his *Miranda* rights, and Defendant confirmed that he understood those rights. Detective Bedoni then asked Defendant if he would like to provide a statement. Defendant emphatically refused, telling Detective Bedoni, "I don't want to talk to you," and "no statement, nothing like that . . . you can't force me."

{20}     Defendant asked for water and told officers that he needed to use the restroom. After collecting blood samples from Defendant's hands, officers gave Defendant water and took him to use the restroom. After returning from the restroom, Detective Bedoni urged Defendant to tell his side of the story. Detective Bedoni told Defendant that King was talking to officers, that officers knew Defendant and King had caused Lossiah's injuries, and that Lossiah might die.

{21}     Defendant ultimately gave two conflicting accounts of the events that occurred at Lossiah's apartment. In the first account, Defendant asserted that Lossiah "pulled a sword" on Defendant and made unwanted sexual advances toward Defendant, but that Defendant did not remember anything else because he "blacked out." Detective Bedoni told Defendant that he did not believe him and encouraged Defendant to tell the truth. Defendant offered, "Well, if I tell you the truth, let me slide." Detective Bedoni replied, "Let you slide? I can't do that. I just want to know the truth. . . . I can't make any promises." Defendant told Detective Bedoni, "I'm gonna keep my mouth shut."

{22}     A few minutes later, a police sergeant entered the room and offered Defendant more water. The police sergeant reiterated that King had been talking and was blaming Defendant for Lossiah's injuries. After further encouragement to tell his side of the story, Defendant finally said, "I'm just going to go ahead and tell you the truth then." Defendant proceeded to give a second account of what had occurred at Lossiah's apartment, incriminating himself and King in the killing of Lossiah. Defendant admitted that he went to Lossiah's home earlier in the day and drank with him. Defendant later met with King, and they decided to rob and beat Lossiah. When police arrived at Lossiah's home, Defendant and King left through the back door, climbed the hill behind the duplex, and drank liquor while watching the police investigation taking place below. Defendant offered to show officers the location of the murder weapon, a "big stick," on the hill behind Lossiah's home. Defendant mentioned that he and King had left an empty liquor bottle near the weapon.

{23}     Officers went to the place Defendant described to look for the wooden club and the liquor bottle, but they were unable to locate the items. Officers brought Defendant to the hill so he could help them find the items. At first, Defendant was unable to locate the wooden club, but then he directed officers to look underneath a piece of sheet metal. When they looked under the sheet metal, officers found Lossiah's wallet, but not the wooden club. Defendant also pointed out the smashed liquor bottle that he

13

and King had left near the sheet metal. Officers returned the next day with King, who helped them locate the wooden club about fifty feet away from the place that Defendant had described.

{24} Prior to trial, Defendant moved the district court to suppress both the incriminating statements he made to police and the physical evidence discovered as a result of those statements. Defendant asserted that the police subjected him to custodial interrogation without obtaining a valid waiver of his *Miranda* rights. Defendant also argued that admitting the physical evidence obtained as a result of such statements would violate Defendant's due process rights because his level of intoxication rendered his statements involuntary. The State agreed that Defendant's statements should be suppressed but argued that the physical evidence should not be suppressed because the statements were voluntary, even though they were made without a valid *Miranda* waiver.

{25} The district court judge viewed the video recording of Defendant's interrogation and held a hearing on Defendant's motion to suppress. Following the hearing, the district court entered a written order suppressing Defendant's statements but not the physical evidence. Regarding Defendant's claim that he was too intoxicated to give a voluntary statement, the district court found that when left alone in the interrogation room, Defendant appeared "to fall asleep while sitting in the chair" and "swayed while

standing." But despite this, the district court found that Defendant "appeared fairly mentally lucid" in the video. When given *Miranda* warnings, Defendant "understood his rights enough to continually reassert that he did not want to talk." The district court found that although "Defendant was 'pestered' by law enforcement to tell his side of the story, the activity of law enforcement during the recorded statement did not include threats of physical violence, mistreatment or overreaching or fear, promises of leniency or other improper inducements that rise to the level of 'official coercion.'" The district court concluded that "a preponderance of the evidence shows that the Defendant's statement was made voluntarily." The district court also explained, "Absent official coercion the Defendant's intoxication in and of itself does not make his statement involuntary."

**{26}** On appeal, we review the voluntariness of Defendant's statements de novo. *State v. Evans*, 2009-NMSC-027, ¶ 32, 146 N.M. 319, 210 P.3d 216. "Voluntariness means freedom from official coercion." *Munoz*, 1998-NMSC-048, ¶ 21 (internal quotation marks and citation omitted). "[W]e review the entire record and the circumstances under which the statement or confession was made in order to make an independent determination of whether a defendant's confession was voluntary." *State v. Fekete*, 1995-NMSC-049, ¶ 34, 120 N.M. 290, 901 P.2d 708. "The prosecution has the burden of proving the voluntariness of a defendant's statement by a preponderance

15

of the evidence." *Id.* "[T]he preponderance of the evidence must establish that the confession was not extracted from an accused through fear, coercion, hope of reward or other improper inducements." *State v. Cooper*, 1997-NMSC-058, ¶ 30, 124 N.M. 277, 949 P.2d 660 (internal quotation marks and citation omitted).

{27} Our independent review of the record, including the video recording of Defendant's interrogation, supports the district court's ruling that Defendant's statements were voluntary. The officers did urge Defendant to tell the truth and give his side of the story, but such conduct does not constitute impermissible coercion. *See Evans*, 2009-NMSC-027, ¶ 43 (explaining that "threats that merely highlight potential real consequences, or are 'adjurations to tell the truth,' are not characterized as impermissibly coercive"). The officers did not question Defendant in an antagonistic manner, mistreat Defendant, threaten Defendant with physical violence, coerce Defendant, or promise Defendant special treatment. To the contrary, when Defendant offered to tell Detective Bedoni the truth if Detective Bedoni would "let [Defendant] slide," Detective Bedoni quickly explained that he could not make Defendant any promises or reward Defendant for providing a statement. *Cf. Evans*, 2009-NMSC-027, ¶ 42 (noting that a promise of leniency may render a confession involuntary).

{28} Defendant concedes that the police used no threats, force, or coercion to obtain a statement but argues that he was too intoxicated to make voluntary statements to

16

police. "[U]nder the totality of [the] circumstances test, a confession is not involuntary solely because of a defendant's mental state." *Fekete*, 1995-NMSC-049, ¶ 35. *See, e.g.*, *Evans*, 2009-NMSC-027, ¶¶ 35-39 (explaining that the defendant's assertion that he was high on methamphetamine and hallucinating when he confessed did not necessarily render the defendant's confession involuntary). A defendant's mental state renders a confession involuntary only when combined with police misconduct or overreaching. *See Fekete*, 1995-NMSC-049, ¶¶ 35, 38. *Compare Cooper*, 1997-NMSC-058, ¶ 47 (holding that the defendant's confession was voluntary because although the defendant was "most likely in a weakened mental state," officers did not exploit the defendant's mental state to obtain the confession), *with Aguilar v. State*, 1988-NMSC-004, ¶ 13, 106 N.M. 798, 751 P.2d 178 (holding that the defendant's confession was involuntary because police took advantage of the defendant's diminished mental capacity and alternated between threatening the defendant and offering the defendant leniency).

{29}     Our review of the video recording confirms that Defendant may have been intoxicated when he confessed. When Detective Bedoni asked Defendant whether he had been drinking that day, Defendant replied, "of course I've been drinking today." Defendant slurred a little while speaking, swayed a little while standing, and fell asleep when left alone in the room. But while talking to the officers Defendant

appeared lucid and aware of the circumstances, and he provided responsive answers to the officer's questions. Defendant stated his age and where he was from, and he engaged Detective Bedoni in conversation, asking whether the detective was Navajo, inquiring about King's whereabouts, and asserting that he wanted to take his case to trial. We conclude that, despite Defendant's intoxication, officers did not exploit Defendant's mental state to obtain a confession through the use of threats, coercion, hope of reward, or other improper inducements. We therefore agree with the district court that Defendant's intoxication did not render his statements involuntary.

{30} Having reviewed the totality of the circumstances de novo, we hold that Defendant's statements were voluntary and affirm the district court's decision to admit the physical evidence that officers obtained as a result of those statements.

**C. The District Court Properly Instructed the Jury Regarding the Mental State Required to Convict Defendant of First-Degree Murder**

{31} Under *Franklin*, 1967-NMSC-151, and *Boyer*, 1985-NMCA-029, Defendant argues that the district court erred by instructing the jury on both first-degree deliberate intent murder, *see* NMSA 1978, § 30-2-1(A)(1) (1994), and first-degree felony murder, *see* § 30-2-1(A)(2). Defendant argues that the jury was confused regarding the intent required to convict him of first-degree murder because deliberate intent murder requires a different mens rea than felony murder. The State asserts that

18

the district court properly instructed the jury and that the jury instructions did not cause any confusion.

**{32}** "Both felony murder and deliberate intent murder are different theories of a single crime, first degree murder." *State v. Fry*, 2006-NMSC-001, ¶ 20, 138 N.M. 700, 126 P.3d 516. "Under New Mexico law, felony murder is a second-degree murder that is elevated to first-degree murder when the murder was committed during the commission or attempted commission of some other dangerous felony." *State v. Montoya*, 2013-NMSC-020, ¶ 15, 306 P.3d 426. By including felony murder in our first-degree murder statute, our Legislature "determined that a killing in the commission or attempted commission of a felony is deserving of more serious punishment than other killings in which the killer's mental state might be similar but the circumstances of the killing are not as grave." *State v. Frazier*, 2007-NMSC-032, ¶ 9, 142 N.M. 120, 164 P.3d 1 (internal quotation marks and citation omitted).

> Our felony murder statute thus serves to elevate to first-degree murder what would otherwise be a second-degree murder based on the rationale that a killing in which the killer's mental state is consistent with second-degree murder, but which is done in the commission of a dangerous felony, deserves punishment equal to that of first-degree premeditated or depraved-mind murder.

*Id.*

**{33}** In this case, the district court properly instructed the jury in accordance with

19

this Court's Uniform Jury Instructions on the elements of both deliberate intent murder and felony murder, including the mental states required to convict Defendant on either theory. With regard to deliberate intent murder, the district court instructed the jury that the State had to prove beyond a reasonable doubt that the killing was done "with the deliberate intention to take away the life of Kevin Lossiah." *See* UJI 14-201 NMRA. Regarding felony murder, the district court instructed the jury that the State had to prove beyond a reasonable doubt that Defendant "intended to kill or knew that his acts created a strong probability of death or great bodily harm." *See* UJI 14-202 NMRA. Having been so instructed, the jury returned a general verdict of guilty on the first-degree murder charge. *See Fry*, 2006-NMSC-001, ¶¶ 18-20 (upholding a general verdict of first-degree murder where the state presented alternative theories of deliberate intent murder and felony murder because "first degree murder is a single crime, whether supported by a single theory or by multiple theories"); *see also State v. Gonzales*, 2007-NMSC-059, ¶ 6, 143 N.M. 25, 172 P.3d 162 (explaining that the jury may convict the defendant of first-degree murder "even if the jurors do not agree on the underlying theory").

{34}     Defendant does not cite any facts in the record indicating that the jury was confused regarding the intent required to convict Defendant of first-degree murder. In the absence of any facts demonstrating that the jury was confused by the

20

instructions, we presume that the jury understood and followed the instructions given by the district court. *See State v. Benally*, 2001-NMSC-033, ¶ 21, 131 N.M. 258, 34 P.3d 1134. We hold that Defendant's claim of jury confusion lacks merit.

**D.     Sufficient Evidence Supports Defendant's Convictions for First-Degree Murder and Tampering with Evidence**

{35}     Under *Franklin*, 1967-NMSC-151, and *Boyer*, 1985-NMCA-029, Defendant asserts that the State presented insufficient evidence to support his first-degree murder and tampering with the evidence convictions. "The test for sufficiency of the evidence is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Duran*, 2006-NMSC-035, ¶ 5, 140 N.M. 94, 140 P.3d 515 (internal quotation marks and citation omitted). "[W]e must view the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Cunningham*, 2000-NMSC-009, ¶ 26, 128 N.M. 711, 998 P.2d 176. "The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (internal quotation marks, citation, and brackets omitted).

## 1.  First-degree Murder

{36}  Defendant argues without elaboration that "the evidence was insufficient to find he killed Mr. Lossiah." In order to prove that Defendant committed deliberate intent first-degree murder, the State had to prove beyond a reasonable doubt that Defendant killed Lossiah with deliberate intention on or about May 29, 2011. *See* UJI 14-201. The district court provided the jury with the following definition of "deliberate intention":

> A deliberate intention refers to the state of mind of the defendant. A deliberate intention may be inferred from all of the facts and circumstances of the killing. The word deliberate means arrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of action. A calculated judgment and decision may be arrived at in a short period of time. A mere unconsidered and rash impulse, even through it includes an intent to kill, is not a deliberate intention to kill. To constitute a deliberate killing, the slayer must weigh and consider the question of killing and his reason for and against such a choice.

*See id.* The district court also instructed the jury to "determine whether or not the defendant was intoxicated from the use of alcohol, and if so, what effect this had on the defendant's ability to form the deliberate intention to take away the life of another." *See* UJI 14-5110 NMRA. Finally, the district court instructed the jury that Defendant could be convicted of deliberate intent murder under an accomplice liability theory. To establish Defendant's guilt under an accomplice liability theory,

22

the State had to prove that Defendant intended that the crime be committed, that the crime was actually committed, and that Defendant "helped, encouraged or caused the crime to be committed." UJI 14-2822 NMRA.

{37} The State presented substantial evidence at trial for a reasonable jury to conclude beyond a reasonable doubt that Defendant either killed Lossiah himself or helped, encouraged, or caused it to happen. Lossiah's next-door neighbor Wesley saw Defendant behind the duplex apartment right before the killing occurred. After the killing, officers found Defendant near Lossiah's home with blood on his skin, clothes, and boots. Defendant and King each possessed a set of keys to Lossiah's vehicle when apprehended. The DNA evidence also linked Defendant and King to Lossiah and the murder scene. Analysts found Lossiah's DNA on Defendant's blood-stained sweatshirt and King's pants, and confirmed that the hair imbedded in the wooded club was Lossiah's hair. A single white sock found on Lossiah's couch tested positive for both Defendant's DNA and Lossiah's DNA, and Defendant was wearing a single white sock when arrested. A reasonable jury could conclude from this evidence that Defendant killed Lossiah.

{38} The State also presented sufficient evidence for the jury to conclude that Defendant had the deliberate intention to kill Lossiah. "Deliberate intent may be inferred from the particular circumstances of the killing as proved by the State through

23

the presentation of physical evidence." *Duran*, 2006-NMSC-035, ¶ 8; *see also State v. Flores*, 2010-NMSC-002, ¶ 19, 147 N.M. 542, 226 P.3d 641 (explaining that "circumstantial evidence alone can amount to substantial evidence"). For example, a reasonable jury might infer deliberate intent to kill from evidence that the defendant intentionally acquired a weapon prior to seeking out and attacking a defenseless victim. *See, e.g.*, *State v. Sosa*, 2000-NMSC-036, ¶ 14, 129 N.M. 767, 14 P.3d 32 (finding sufficient evidence of deliberate intent where the defendant went armed to the victim's home, waited for the victim to arrive, shot at the unarmed victim, and continued the attack after the victim tried to flee); *Cunningham*, 2000-NMSC-009, ¶ 28 (finding sufficient evidence of deliberate intent where the defendant fired the fatal shot at the victim after the victim was incapacitated and defenseless). A reasonable jury might also infer deliberate intent to kill from evidence demonstrating that the victim sustained multiple injuries during the course of a prolonged struggle. *See Duran*, 2006-NMSC-035, ¶ 8. *See, e.g.*, *State v. Guerra*, 2012-NMSC-027, ¶ 29, 284 P.3d 1076 (finding sufficient evidence of deliberate intent where the defendant "stabbed the victim thirteen times" and "many of the wounds were to vital organs"); *Flores*, 2010-NMSC-002, ¶ 22 (finding sufficient evidence of deliberate intent where the defendant stabbed the victim with a screwdriver "so many times that it evidenced an effort at overkill").

24

{39} In this case, the State presented evidence demonstrating that (1) Lossiah was beaten so badly that his brain could be seen through his scalp; (2) during the course of the attack, blood splattered on the ceiling, walls, and furniture; (3) Lossiah begged his attackers to stop; (4) Lossiah died from blunt force injuries to the head; (5) police found a wooden club with Lossiah's hair on it; (6) the wood of the club matched the tree limbs in a brush pile behind Lossiah's home; and (7) a witness saw Defendant behind Lossiah's home before Lossiah was murdered. A reasonable jury could infer from this evidence that Defendant armed himself with a wooden club from the brush pile behind Lossiah's home, entered Lossiah's home intending to beat Lossiah with the club, and continued the attack even when Lossiah was severely injured and begged Defendant to stop. We conclude that a reasonable jury could infer deliberate intent to kill from this evidence.

{40} Finally, the State presented sufficient evidence to prove that Defendant was not too intoxicated to form the deliberate intent to kill. Officer Martinez testified that although Defendant was intoxicated, Defendant spoke coherently and answered questions in a linear manner. We conclude that the evidence presented at trial, when viewed as a whole in the light most favorable to the State, supports the jury's conclusion that intoxication did not prevent Defendant from forming the deliberate intention to take away the life of another.

{41} We hold that sufficient evidence supports each element required to sustain Defendant's conviction for deliberate intent first-degree murder under Section 30-2-1(A)(1), and accordingly, we do not need to consider felony murder as an alternative basis for affirming Defendant's first-degree murder conviction. *See State v. Rojo*, 1999-NMSC-001, ¶ 24, 126 N.M. 438, 971 P.2d 829.

**2.    Tampering with Evidence**

{42}    The State had to prove the following elements beyond a reasonable doubt to convict Defendant of tampering with evidence:

1.    The defendant hid or placed the wooden club;
2.    By doing so, the defendant intended to prevent the apprehension, prosecution or conviction of himself or create the false impression that another person had committed a crime;
3.    The defendant was not intoxicated from use of alcohol at the time the offense was committed to the extent of being incapable of forming an intention to prevent his apprehension, prosecution or conviction or create the false impression that another person had committed a crime;
4.    This happened in New Mexico on or about the 29th day of May, 2011.

*See* NMSA 1978, § 30-22-5(A) (2003); UJI 14-2241 NMRA. "Tampering with evidence is a specific intent crime," and the State must present "sufficient evidence from which the jury can infer that the defendant acted with an intent to prevent 'apprehension, prosecution or conviction of any person or to throw suspicion of the commission of a crime upon another.'" *State v. Silva*, 2008-NMSC-051, ¶ 18, 144

26

N.M. 815, 192 P.3d 1192 (quoting Section 30-22-5(A)). Specific intent to tamper with evidence "is almost always inferred from other facts in the case, as it is rarely established by direct evidence." *Silva*, 2008-NMSC-051, ¶ 18 (internal quotation marks and citation omitted). "Thus, when direct evidence of an intent to disrupt the investigation is lacking, it is often inferred from an overt act of the defendant." *Id.*

{43} In this case, the evidence demonstrated that someone removed the murder weapon, the wooden club, from the crime scene and placed the club in an irrigation ditch in the wooded area behind Lossiah's home. Defendant was wet and muddy when officers apprehended him near Lossiah's home after the killing and had scratches on his back and shoulders consistent with having run through weeds or brush. And as noted above, Officer Martinez testified that Defendant was coherent and responsive when apprehended. A reasonable jury could conclude from this evidence that Defendant placed the wooden club in the irrigation ditch with the intent to prevent his apprehension, prosecution, or conviction. We hold that sufficient evidence supports Defendant's tampering with evidence conviction.

**E.    There Was No Cumulative Error**

{44} Defendant argues that the errors raised on appeal require reversal under the cumulative error doctrine. "The doctrine of cumulative error requires reversal when a series of lesser improprieties throughout a trial are found, in aggregate, to be so

27

prejudicial that the defendant was deprived of the constitutional right to a fair trial." *State v. Guerra*, 2012-NMSC-014, ¶ 47, 278 P.3d 1031 (internal quotation marks and citation omitted). "The cumulative error doctrine is strictly applied and may not be successfully invoked if the record as a whole demonstrates that the defendant received a fair trial." *Id.* (internal quotation marks and citation omitted). We have found no error when reviewing Defendant's claims and conclude that Defendant received a fair trial. Accordingly, we hold that there was no cumulative error.

## F.     The State Is Not Entitled to Relief under Rule 12-201(C) NMRA.

{45}     The district court did not enter a judgment and sentence on Defendant's convictions for armed robbery or conspiracy to commit armed robbery because the prosecution and defense stipulated that these convictions should "merge into" Defendant's first-degree murder conviction. On appeal, the State asserts that the district court lacked authority to merge the convictions. Defendant argues that the district court properly vacated the armed robbery and conspiracy to commit armed robbery convictions because those crimes were the predicate felonies to felony murder. *See Frazier*, 2007-NMSC-032, ¶ 1 (explaining that "double jeopardy principles prohibit convicting a defendant of both felony murder and the predicate felony on which the felony murder is based"); *see also Gonzales*, 2007-NMSC-059, ¶¶ 10-12 (vacating the defendant's conviction for the predicate felony because the jury

28

was instructed on alternate theories of deliberate intent murder and felony murder, and the jury returned a general verdict of guilty on the first-degree murder charge). The State concedes that the district court may have merged the armed robbery conviction to avoid a double jeopardy violation but notes that "it is unclear why the parties agreed that the conspiracy to commit armed robbery conviction" should also merge. *See State v. Armijo*, 1976-NMCA-126, ¶ 22, 90 N.M. 12, 558 P.2d 1151 (explaining that "the commission of the substantive offense and a conspiracy to commit it are separate and distinct offenses" and that "double jeopardy is no defense to a conviction for both offenses").

{46}     The State did not file a cross-appeal in this case and does not contend that it has a right to appeal the district court judgment. *See generally* NMSA 1978, § 39-3-3 (1972) (providing the circumstances under which the State has a right to appeal from the district court). Instead, the State urges this Court to consider its claim of error under Rule 12-201(C) NMRA. Rule 12-201(C) provides that:

> [a]n appellee may, without taking a cross-appeal or filing a docketing statement or statement of the issues, raise issues on appeal for the purpose of enabling the appellate court to affirm, or raise issues for determination only if the appellate court should reverse, in whole or in part, the judgment or order appealed from.

We conclude that Rule 12-201(C) does not apply to the State's claim of error. The State asks us to remand this case to the district court for resentencing even if we

29

otherwise reject Defendant's claims and affirm the district court. Thus, the State does not raise the issue solely for the purpose of enabling us to affirm the district court judgment or for determination only if we should reverse the district court judgment.

**{47}** Defendant argues that the State's claim of error is not properly before this Court because the State failed to preserve the error. *See* Rule 12-216 NMRA. We agree and observe that a party cannot preserve error when the party takes one position at trial and a contrary position on appeal. At Defendant's sentencing hearing, the prosecutor told the district court that the armed robbery and conspiracy to commit armed robbery convictions should merge with the first-degree murder conviction. The district court did what the prosecutor asked it to do. To the extent that the district court may have erred by merging both the armed robbery conviction and conspiracy to commit armed robbery conviction into the first-degree murder conviction, the State invited this error and may not complain of the error on appeal. *See State v. Urioste*, 2011-NMCA-121, ¶ 44, 267 P.3d 820 (explaining that "invited error provides no grounds for appeal"). We conclude that the State's claim of error is not properly before this Court, and we decline to address it further.

**III. CONCLUSION**

**{48}** We hold that Defendant's claims lack merit and affirm Defendant's convictions for first-degree murder and tampering with evidence.

{49}    **IT IS SO ORDERED.**


_____
**BARBARA J. VIGIL, Chief Justice**

**WE CONCUR:**


_____
**PETRA JIMENEZ MAES, Justice**


_____
**RICHARD C. BOSSON, Justice**


_____
**EDWARD L. CHÁVEZ, Justice**


_____
**CHARLES W. DANIELS, Justice**

31